**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | |
|---|---|
| Ratliff CPA Firm, PC, a South Carolina Professional Corporation, individually and on behalf of a class of similarly situated businesses and individuals,<br><br>Plaintiff,<br><br>vs.<br><br>Kabbage, Inc., Customers Bancorp, Inc., Customers Bank, and DOES 1 through 100, inclusive,<br><br>Defendants. | Civil Action No.:  **2:20-cv-2955-BHH**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1. DECLARATORY RELIEF**<br><br>**2. BREACH OF CONTRACT, THIRD-PARTY BENEFICIARY**<br><br>**3. UNJUST ENRICHMENT**<br><br>**4. CONVERSION**<br><br>**5. MISAPPROPRIATION**<br><br>**(JURY TRIAL DEMANDED)** |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Ratliff CPA Firm, PC ("Plaintiff or "Ratliff") brings this Class Action Complaint and Demand for Jury Trial (the "Complaint") on behalf of itself and those similarly situated against Defendants Kabbage, Inc., Customers Bancorp, Inc. and Customers Bank (individually "Kabbage," Customers Bancorp, Inc. and Customers Bank as "Customers" and collectively together hereinafter "Defendants") and DOES 1 through 100, inclusive, to seek compensation from Defendants, who refuse to pay out of the compensation they received for processing PPP loans, for services Plaintiff and a large number of other agents rendered on behalf of recipients of Small Business Administration ("SBA") 7(a) emergency loans, as required under the CARES Act. For its class action complaint, Plaintiff alleges as follows based upon its personal knowledge and upon information and belief, to include investigations conducted by its attorneys.

1

## NATURE OF THE ACTION

1.      In response to the shut-down of virtually every business across all non-essential industries due to COVID-19, the federal government has raced over the past few months to ease the impact of the shut-down on the U.S. economy.  In order to keep afloat small businesses, and to encourage those businesses to avoid massive worker layoffs and furloughs further damaging the economy, Congress decided to create an economic relief program to distribute money to small businesses.

2.      In order to distribute the money swiftly to small businesses, Congress decided to utilize the nation's financial institutions and other non-bank SBA-approved lenders to take applications and distribute the funds that would be fully guaranteed by the federal government. However, in order to avoid delay in disbursing funds to businesses, Congress decided that the financial institutions and other non-bank SBA-approved lenders would not be required to verify the accuracy of the applications.  Instead, the burden to provide accurate information was put directly and solely on the small businesses submitting applications.

3.      The applications would need to be simple and the amount of the economic relief would be based on historical payroll information with specific limitations.  However, as the lenders would not be verifying the information, there would need to be a number of representations and certifications, and specific warnings because the failure to provide true and accurate information could subject the small business owner to five (5) years in prison and a $250,000 fine.

4.      In order for these small businesses to be able to make timely, truthful, and accurate applications, Congress understood that small businesses would need assistance from the nation's

professional accountants, tax preparers, financial advisors, attorneys, and other such agents normally relied upon by small businesses.

5.    On March 27, 2020, the United States Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (hereinafter the "CARES Act"). A signature piece of this landmark legislation is the SBA's Paycheck Protection Program ("PPP") which initially authorized up to $349 billion in forgivable loans to small businesses to cover payroll and other expenses ("PPP I").  After the initial funds quickly dried up, Congress added $310 billion additional dollars to the program ("PPP II").

6.    Congress provided that PPP loans would be disbursed through SBA-approved lenders, though the loans themselves would be guaranteed by the federal government. In exchange for their participation, lenders would receive a percentage of each loan as an origination fee.

7.    The PPP was designed to be fast and straightforward, allowing business to apply through SBA-approved lenders and await approval.  Once approved, lenders would be compensated in the form of a generous origination fee paid by the federal government, with the requirement that the lender would be responsible for paying the fee owed to the loan applicant's agent (e.g., attorney or accountant).  Both the lender and the agents were specifically forbidden by the PPP from charging the small business borrower any amounts for the loan or the assistance in preparing the application for the lending.  The amount of the total compensation and the allocation between the lender and the agents assisting the borrowers in preparing the application was specifically laid out in the PPP.  For the majority of the loans (those under $350,000), the lender would receive an amount equal to 5% of the loan as compensation, and if the borrower used an agent such as a CPA or accountant, the lender was to pay to the agent an amount equal

to 1% of the loan amount. In other words, for the allocation of the compensation, 80% went to the lender and 20% went to the agent assisting the small business borrower. In fact, SBA's PPP regulations specifically directed lenders to pay agents from these lender fees, as shown below:

> *Who pays the fee to an agent who assists a borrower?*
>
> Agent fees *will* be paid by the lender out of the fees the lender receives from SBA. Agents may not collect fees from the borrower or be paid out of the PPP loan proceeds. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:
>
> i.      One (1) percent for loans of not more than $350,000;
>
> ii.     0.50 percent for loans of more than $350,000 and less than $2 million; and
>
> iii. 0.25 percent for loans of at least $2 million. (emphasis added).[1]

8.     In order to avoid delay, Congress decided that the lenders would not be required to verify the accuracy of the applications. Instead, the burden to provide accurate information was put directly and solely on the small businesses submitting applications. The applications would need to be simple and the amount of the economic relief would be based on historical borrower payroll information with specific limitations. Because lenders would not be verifying the information, there would need to be a number of borrower representations and certifications, and specific warnings that failure to provide true and accurate information could subject the small business owner to five years in prison and a $250,000 fine. In order for these small businesses to be able to make timely, truthful and accurate applications, Congress understood that small businesses would need assistance from the nation's professional accountants, tax preparers, financial advisors, attorneys, and other such agents normally relied upon by small businesses.

---

[1] SBA Interim Final Rule, 85 Fed. Reg. 20816 § (4)(c).

9.      Defendant Kabbage is a financial, data, and technology company that was approved as a non-bank SBA approved lender for the PPP. Kabbage both issued PPP loans as an SBA-authorized lender as well as in partnership with other approved SBA Lenders, serving as the originator for lenders such as Customers. Kabbage[2] actively processed PPP I and PPP II loans, accepting online applications from its customers and their agents within the district. Kabbage directly funded approximately 55% of the PPP loans it originated, while partnering with Customers to fund approximately 23% of the PPP loans Kabbage originated.[3]

10.     Defendant Customers is a subsidiary of Customers Bancorp, Inc. and holds approximately $12 billion in assets. Defendant Customers is a traditional SBA-approved Lender for the PPP that both originated and serviced PPP loans for its customers as well as serviced PPP loans through other online lenders, such as Kabbage.[4]

11.     Kabbage represents that it has "approved over 209,000 small businesses for $5.8 billion, making it the third-largest PPP lender in the country by application volume."[5] Assuming a conservative average fee of four percent, upon information and belief, Kabbage has been allocated approximately $232 million in origination fees from which it was required to pay the agents who assisted the borrowers in submitting applications.

12.     Defendant Customers also represents that it has originated over "80,000 PPP loans nationwide helping to provide payroll for an estimated 1 million employees across America."[6]

---

[2] See *Kabbage Company, News, Technology*, available at https://newsroom.kabbage.com/news/kabbage-soars-to-over-209000-approved-paycheck-protection-program-applications-for-5-8-billion/ (last visited August 12, 2020).
[3] See Kabbage PPP Results: A Historic Feat for FinTech, available at https://newsroom.kabbage.com/wp-content/uploads/2020/07/Kabbage-Paycheck-Protection-Program-PPP-Report.pdf (last visited August 12, 2020).
[4]      See Customers Bank Paycheck Protection Program Loan Forgiveness, available at https://www.customersbank.com/business-banking/sba-guaranteed-lending/disaster-relief/ (last visited August 12, 2020).
[5] See *Kabbage Company, News, Technology*, available at https://newsroom.kabbage.com/news/kabbage-soars-to-over-209000-approved-paycheck-protection-program-applications-for-5-8-billion/ (last visited August 12, 2020).
[6] See Customers Bank Press Release (May 21, 2020), available at https://www.customersbank.com/investor-relations/press-releases/customers-bank-preserves-estimated-1-million-jobs-across-america-originating-over-

13.    However, Defendants have decided they do not need to complete the final step of the process and have refused to pay the agents who assisted PPP loan recipients with their applications.  This company-wide practice seemed to be a deliberate scheme from the beginning as even though Defendants were required to pay agents that assisted in the application process, they did not set up a structure or ask any questions to determine whether borrowers utilized an agent in completing applications.  It appears that this scheme was to claim ignorance of the existence of the agent as an excuse not to pay agents their share of compensation.

14.    Now that PPP loans have been disbursed to borrowers, Defendants have refused to pay Plaintiff and other similarly-situated agents their statutorily-mandated fees.  Their refusal is harming accountants,  attorneys, and other agents who dropped everything (in the midst of tax season) to assist their customers in filling out these vital loan applications correctly and in compliance with the PPP, and who were specifically only allowed to be paid for these services out of the compensation paid to the lender.  Customers' position is in direct contravention of its own stated position that "the program guidelines and federal applications are, however, changing frequently. We strongly recommend that you consult with your attorneys, CPAs, tax advisors, and financial consultants."[7]  Defendants' failure to pay agents is in blatant violation of PPP regulations stating that agent fees "will be paid by the lender out of the fees the lender receives from SBA."[8]  Accordingly, Plaintiff brings this class action lawsuit to recover fees for the work it and other agents performed assisting borrowers with PPP loan applications submitted to Defendants which should have been compensated by Defendants.

---

80000-ppp-loans-supports-local-communities-with-charitable-grants-protects-team-members-and-clients-celebrates/ (last visited August 12, 2020).

[7]    See  Customers  Bank  Paycheck  Protection  Program  Loan  Forgiveness,  available  at https://www.customersbank.com/business-banking/sba-guaranteed-lending/disaster-relief/ (last visited August 12, 2020).

[8] SBA Interim Final Rule, Federal Register, Vol. 85, No, 73, first issued on April 2, 2020.

15.    These agents, including Plaintiff, have no other recourse for collecting fees for assisting borrowers on PPP loan applications because the PPP regulations delegate the responsibility for paying agents to the lenders *alone*.  And yet, Defendants have disregarded the regulations and refused to pay agents who assisted small businesses in receiving PPP funds.

16.    Plaintiff has been harmed by Defendants' practices. As a CPA firm that provides corporate and individual tax advice, accounting, payroll, and other small-business support functions, Plaintiff was naturally positioned to assist clients who submitted applications to Defendants and were then funded through the PPP program.  Plaintiff assisted at least three small business clients who submitted an application to Defendants and were then funded through the PPP program.   Based on information and belief, Defendants have or will receive the 5% compensation from that loan, but have not paid Plaintiff its 1% agent fee related to the loans.

17.    As a result of Defendants' acts and omissions, Plaintiff, and a large number of others like it are being deprived of payment for their critical work in supporting their clients' PPP loan applications.  As such, Plaintiff brings this Class Action Complaint and Demand for Jury Trial in order to vindicate its rights and those of agents everywhere who are similarly situated, to force Defendants to account for its blatant violation of the PPP, and to pay agents their legally-mandated portion of the compensation.

## PARTIES

18.    Plaintiff Ratliff is a South Carolina Professional Corporation with its principal place of business in Mount Pleasant, South Carolina. Ratliff provides corporate and individual taxation advice to its clients and performs financial planning and consulting for both businesses and individuals in the local community. Ratliff meets the criteria to be a PPP agent under the CARES Act.

19.      Defendant Kabbage, Inc. is incorporated in the State of Delaware and headquartered in Atlanta, Georgia.

20.      Defendant Customers Bancorp, Inc. is incorporated in the State of Pennsylvania and headquartered in Phoenixville, Pennsylvania. Defendant Customers Bank is a subsidiary of Customers Bancorp, Inc.

21.      When in this Complaint reference is made to any act of any Defendant, such shall be deemed to mean that officers, directors, agents, employees, or representatives of the Defendant named in this lawsuit committed or authorized such acts, or failed and omitted to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of the Defendant and did so while acting within the scope of their employment or agency.

22.      Plaintiff is unaware of the names, identities, or capacities of the Defendants sued as Does 1-100, but is informed and believes and thereon alleges that each such fictitiously-named defendant is acting as a lender and providing PPP loans to small businesses and is responsible in some manner for the damages and abridgement of rights described in this Complaint. Plaintiff will amend its Complaint to state the true names, identities, or capacities of such fictitiously-named defendants when ascertained.[9]

## JURISDICTION AND VENUE

23.      This Court has subject matter jurisdiction over this Action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because, as the proposed Class, (1) at least one member of the proposed Class, which consists of at least 100 members, is a citizen of a different state than

---

[9] Plaintiff is aware that in South Carolina alone, there are 67,176 approved loans for a total of $5,791,085,572 to small businesses in this state. See U.S. Small Business Administration Paycheck Protection Program (PPP) Report, Approvals through 08/08/2020, https://home.treasury.gov/system/files/136/SBA-Paycheck-Protection-Program-Loan-Report-Round2.pdf (last accessed August 12, 2020).

Defendants; (2) the claims of the proposed Class Members exceed $5,000,000 in the aggregate, exclusive of interest and costs, and (2) none of the exceptions under that subsection apply to this action.

24.     Personal jurisdiction over Defendants is proper because Defendants transact business in the State of South Carolina and a substantial number of the events giving rise to the claims alleged herein took place in South Carolina.

25.     This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under 85 Fed. Reg. 20816 § (4)(c) (hereinafter, the "PPP regulations").

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the alleged claims occurred in this District, including from work performed by Ratliff on behalf of business clients within this District, and Defendants marketed, promoted, and accepted applications for PPP loans in this District.

## **BACKGROUND**

27.     The spread of COVID-19 was declared a pandemic by the World Health Organization ("WHO") on March 11, 2020.

28.     On March 13, 2020, President Donald Trump issued the Coronavirus Disease 2019 (COVID-19) Emergency Declaration, which declared that the pandemic was of "sufficient severity and magnitude to warrant an emergency declaration for all states, territories and the District of Columbia."

29.     The Federal Government expressly recognized that with the COVID-19 emergency, "many small businesses nationwide are experiencing economic hardship as a direct

result of the Federal, State and local public health measures that are being taken to minimize the public's exposure to the virus."[10]

30.    The economic fallout from COVID-19, and the national response to it, was immediate and enormous.  As "stay at home" issues were ordered by states across the nation, countless businesses were forced by law to overhaul their business models, scale back their business dramatically, or shutter–either temporarily or permanently.  Businesses were further harmed as the public began to avoid all public spaces.  Furloughs and layoffs were rampant in the private sector.

31.    On March 26, 2020, in response to the economic damage caused by the COVID-19 crisis and the overwhelming public pressure that resulted from it, the U.S. Senate passed the Coronavirus Aid, Relief, and Economic Security, or CARES, Act.  The CARES Act was passed by the House of Representatives the following day and signed into law by President Trump on March 27, 2020.  Amounting to approximately $2 trillion, the CARES Act was the single-largest economic stimulus bill in American history.

32.    Critically, the CARES Act created a $659 billion loan program for businesses with fewer than five hundred employees, the PPP.[11]  The goal of the PPP was to provide American small businesses with eight weeks of cash-flow assistance, with a certain percentage forgivable if utilized to retain employees and fund payrolls.  The loans are fully federally guaranteed and administered by the SBA.[12]

---

[10] See *Business Loan Program Temporary Changes; Paycheck Protection Program,* 13 CFR Part 120, Interim Final Rule ("SBA PPP Final Rule").

[11] The initial $349 billion in funding was all allocated within the span of thirteen (13) days, stopping many small businesses from taking advantage of the PPP. Accordingly, Congress approved an additional $310 billion in funding through the Paycheck Protection Program and Health Care Enhancement Act, signed by President Trump on April 24, 2020.

[12] Small Bus. Admin., Docket No. SBA-2020-0015, 13 CFR Part 120, Paycheck Protection Program 3245-AH34, Interim Final Rule, 85 Fed. Reg. 20814 § (2)(o) (Apr. 15, 2020).

33.     The PPP loans operate more like grants if the recipient follows certain rules, including that at least 75 percent of the loan goes toward payroll.[13]   Businesses that follow the rules are permitted to submit a request to their SBA lender for total forgiveness.  Otherwise, the loan matures in two years and carries a one percent interest rate.[14]

34.     The SBA was charged with creating the PPP implementing regulations.  The SBA issued the first interim final rule ("Initial Rule") on April 2, 2020, allowing businesses to begin applying for PPP loans with all SBA lenders on April 3, 2020.

35.     An important piece of the PPP was that applications were to be processed and funded on a "first-come, first-served" basis—that is, the SBA was to process applications and distribute funds based on the order in which they were received.  This made the SBA's list of approved lenders key gatekeepers in this process, which the lenders certainly understood.  Because the PPP was to be administered only through SBA-approved lenders, and because applicants were applying for funds from the single pot allocated for the program, submitting an accurate application for a loan through the SBA-approved lender as quickly as possible was critical.

36.     Congress added an incentive for the SBA-affiliated lenders, knowing they would be inundated with PPP loan applications:  for each loan processed and approved, the bank would receive an origination fee of five percent for loans up to $350,000; three percent for loans between $350,000 and $2 million; and one percent for loans between $2 million and $10 million.[15]

---

[13] 85 Fed. Reg. 20812 § (2)(e); id. at 20813 § (2)(o).
[14] Id. at 20813 § (2)(j).
[15] Id.

37.     With similar incentives in mind, Congress and the SBA also carved out a specific benefit for the countless accountants, attorneys, and advisors who would need to lead or assist their clients in preparing and filing PPP loan applications.  These individuals and entities are referred to as "Agents" in the CARES Act and PPP implementing regulations.

38.     As explained in the PPP Information Sheet provided for "lenders," the SBA states that '[a]n 'agent' is an authorized representative and can be: an attorney; an accountant; a consultant; someone who prepares an applicant's application for financial assistance and is employed and compensated by the applicant; someone who assists a lender with originating, disbursing, servicing, liquidating, or litigating SBA loans; a loan broker; or any other individual or entity representing an applicant by conducting business with the SBA."[16]

39.     In addition, the SBA Regulations provide that "Agent fees **will** be paid out of lender fees.  The lender will pay the agent.  **Agents may not collect any fees from the applicant**. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP" loan is as follows ("Agent Fees"): one percent (1%) for loans up to $350,000; 0.50% for loans between $350,000 and $2 million; and 0.25% for loans between $2 million and $10 million."[17]

40.     Within this context, Congress and the SBA set up a straightforward system for the disbursement of PPP loan funds where the applicant is assisted by an agent: (i) the agent prepares the application and/or necessary supporting application documents for the client; (ii) the client or agent applies for the PPP loan through the lender; (iii) the lender submits the application to the SBA; (iv) the SBA approves the loan and sends the client the money through the lender, and

---

[16] U.S. Department of the Treasury, Small Business Paycheck Protection Program Information For Lenders, https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf (last accessed May 26 2020).
[17] Id. (emphasis added); see also 85 Fed. Reg. 20816 § (4)(c).

eventually pays the lender's origination fee; and (v) the agent submits the request for fee payment to the lender with the agent's fee based upon (a) the work performed for the client and (b) the caps on agent fees provided by the SBA's PPP regulations.

41.    Unfortunately, Defendants did not comply with the SBA Regulations in distributing PPP Agent Fees to PPP Agents. Instead, Defendants took the position that they would not and do not pay Agent Fees for agent assistance in providing an accurate and truthful application for funding.

42.    This refusal is a company-wide policy.  Further, the fact that Kabbage set up the application process without even asking borrowers if they utilized an agent to assist them suggests that Defendants did not want to have any record of the agent information in its files.

43.    This policy of refusal to pay agents the "Agent Fees" due to them, and that *only* the lenders are authorized to pay, stands as an immediate threat to these agents' abilities to receive payment.  In the midst of an unprecedented economic/pandemic crisis, this policy represents short-sighted profit-padding at best, and blatantly illegal conduct, at worst.

44.    Refusing to pay Agent Fees is also inconsistent with agreements Defendants made in order to become an approved PPP lender.  Specifically, based on information and belief, Defendants were required to fill out and sign the "CARES Act Section 1102 Lender Agreement" for each loan.    This agreement requires each putative PPP lender to certify, under penalty of perjury, that it (i) "is in compliance and will maintain compliance with all applicable requirements of the [PPP], and PPP Loan Program Requirements[,]" (ii) will "service and liquidate all covered loans made under the Paycheck Protection Program in accordance with PPP Loan Requirements[,] and (iii) will "close and disburse each covered loan in accordance with the terms and conditions of the PPP Authorization and PPP Loan Requirements."[18]

---

[18] U.S. Small Business Administration CARES Act Section 1102 Lender Agreement, https://www.sba.gov/sites/default/files/2020-

45.    To the extent Defendants had to certify, at any point, that it would follow the PPP's regulations in making PPP loans, it was not being truthful.  Defendants' policy to refuse to pay third-party agents fees directly violates the PPP's implementing regulations.

46.    It is pursuant to these representations that Kabbage was able to process over 209,000 PPP applications worth over $5.8 billion in funding. Assuming a conservative average fee of four percent, Kabbage has been allocated over $232 million in origination fees, from which it was required to pay agents.

47.    Ultimately, despite knowing that they were required to pay agents a percentage of their PPP loan origination fees if an agent assisted an applicant in preparing and submitting the application, Defendants elected not to ask borrowers whether they utilized an "agent" (or purposely left off this inquiry when developing its application procedures) to assist them in the application process and have not paid Plaintiff or similarly situated agents compensation from funded PPP loans.

## FACTUAL ALLEGATIONS

48.    Ratliff is a CPA firm with locations in Mount Pleasant, South Carolina; Sumter, South Carolina; and Mt. Prospect, Illinois. John W. Ratliff, III, the sole owner of Ratliff, has been a professional accountant since 1975 and has provided public accounting services to clients for thirty-six (36) years.  Ratliff currently has approximately 1,000 clients that it services between its three locations. Upon information and belief, approximately 50 are small businesses and/or sole proprietorships. Ratliff, knowing that the COVID-19 crisis would significantly impact

---

04/SBA%20Form%203506%20CARES%20Act%20Section%201102%20Lender%20Agreement%2004022020.pdf (last accessed May 26, 2020)

clients' businesses, sought to obtain PPP loans through various SBA-approved lenders on behalf of clients.

49.     Ratliff's professionals spent considerable time familiarizing themselves with the CARES Act and the related SBA Regulations, in particular (a) Section 1102, which permits the SBA to guarantee 100% of Section 7(a) loans under the PPP and (b) Section 1106 of the Act, which provides forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

50.     In or about March, April and May 2020, Ratliff assisted many clients in the gathering and analysis of their documents, as well as the calculations and preparation of the loan applications.

51.     Based on the SBA Regulations, Ratliff understood that it was not allowed to charge clients a fee relating to the application process.  The agents were only allowed to receive compensation from the agents' share of the estimated $20 billion in fees that the Federal Government paid the lenders for originating the PPP loans.

52.     For its clients, Ratliff had the primary role in calculating the payroll information needed for the application, and providing the clients' accounting information, advice, documentation in support of the PPP loan application, and will have ongoing responsibility for advising on the forgiveness of the PPP loan.

53.     Ratliff provided all of these services to three different clients (hereinafter, "Client BM," "Client PT", and "Client SR"). Client BM and Client PT obtained the PPP loan directly from Defendant Kabbage. Client SR applied for a loan through Defendant Kabbage, but Defendant Customers funded the PPP loan amount.

54.    Client BM obtained a loan from Defendant Kabbage on June 19, 2020 in the amount of $12,017. Based upon information and belief, Defendant Kabbage was paid or will be paid, an origination fee of $600.85, of which Ratliff is entitled to $120.17 (1% of the total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation.

55.    Client PT obtained a PPP loan from Defendant Kabbage on June 24, 2020 in the amount of $10,066.00. Based upon information and belief, Defendant Kabbage was paid or will be paid, an origination fee of $503.30, of which Ratliff is entitled to $100.66 (1% of the total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation.

56.    After submitting an online application through Defendant Kabbage, Client SR obtained a PPP loan from Defendant Customers on April 13, 2020 in the amount of $77,857.00 Based upon information and belief, Defendants were paid or will be paid, an origination fee of $3,892.85, of which Ratliff is entitled to $778.57 (1% of total loan amount) of that fee for its work as the agent of the borrower in submitting the application and documentation.

57.    Defendants did not comply with the SBA Regulations because it has not paid Ratliff any agent fees despite awarding PPP loans to Ratliff's client for whom Ratliff acted as a PPP agent. Instead, Defendants retained all of the Agent Fees for itself. Defendants have refused to respond to the inquiries made about payment of Ratliff's fees for service as PPP agent.

58.    As a result of Defendants' unlawful and unfair actions, Plaintiff and the Class have suffered financial harm by being deprived of the statutorily-mandated compensation for the professional services provided to clients in assisting them with obtaining PPP loans.

## CLASS ALLEGATIONS

59.     As noted above, Plaintiff brings this action on behalf of itself and all others similarly situated as a nationwide Class, defined as follows:

> All persons and businesses who served as an agent in relation to, and provided assistance to a client in relation to, the preparation and/or submission of a client's PPP loan application to Defendant Kabbage, which resulted in a loan being funded by Defendant Kabbage or Defendant Customers under the PPP.
>
> **South Carolina Subclass.** All persons and businesses in South Carolina who served as an agent in relation to, and provided assistance to a client in relation to, the preparation and/or submission of a client's PPP loan application to Defendant Kabbage which resulted in a loan being funded by Defendant Kabbage or Defendant Customers under the PPP.

60.     Excluded from this Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants subsidiaries, parents, successors, predecessors, and any entity in which Defendants or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

61.     Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or more subclasses, in connection with Plaintiff's motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

62.     *Numerosity*: The Class is composed of hundreds of agents ("Class Members"), whose joinder in this action would be impracticable. The disposition of their claims through this class action will benefit all Class Members, the parties, and the courts.

63.    *Commonality and Predominance*: There is a commonality in questions of law and fact affecting the Class, the answers to which will drive the resolution of the litigation, and which are capable of classwide resolution. These questions of law and fact predominate over individualized questions affecting individual Class Members, including, but not limited to, the following:

a.   Whether Defendants' conduct violates the CARES Act and/or its implementing regulations;

b.   Whether Defendants are required under the CARES Act and/or its implementing regulations to compensate Plaintiff and Class Members agent fees for their services assisting PPP loan applications out of the origination fees obtained from SBA through the PPP;

c.   Whether Plaintiff is entitled to compensation by Defendants for its work assisting in its client's PPP loan application;

d.   Whether Plaintiff is entitled to compensation by Defendants for Plaintiff's work assisting in its client's PPP loan application;

e.   Whether Defendants' conduct was willful and knowing;

f.   Whether Defendants' submission of completed Form 2484 constituted an agreement;

g.   Whether Defendants breached that agreement;

h.   Whether Defendants' conduct was pursuant to a company-wide policy or policies; and

i.    Whether Defendants' conduct constitutes unjust enrichment;

j.   Whether Class Members are entitled to damages and/or restitution; and

k.  Whether Plaintiff and Class Members are entitled to an award of reasonable attorney's fees, pre-judgment interest and costs of the suit.

64.  *Superiority*: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy given that joinder of all parties is impracticable.  The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions.  Thus, it would be difficult and not economical for the individual members of the Class to obtain effective relief from Defendants' misconduct.  Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint.  By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.  Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

65.  *Typicality*: Plaintiff's claims are typical of, and are not antagonistic to, the claims of all Class Members, in that Plaintiff and members of the Class sustained damages arising out of Defendants' uniform wrongful conduct.

66.  *Adequacy*: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel with substantial experience in litigating complex cases, including class actions.  Plaintiff's claims are representative of the claims of the other members of the Class.  That is, Plaintiff and members of the Class sustained damages as a result of Defendants' uniform conduct.  Plaintiff also has no interests antagonistic to those of the Class,

and Defendants have no defenses unique to Plaintiff. Both Plaintiff and its counsel will vigorously prosecute this action on behalf of the Class and have the financial ability to do so. Neither Plaintiff nor counsel have any interest adverse to other Class Members. Rather, Plaintiff shares the same interest as all Class Members in remedying Defendants' unlawful conduct.

67.     *Ascertainability*: Plaintiff is informed and believes that Defendants keep extensive computerized records of its loan applications through, *inter alia,* computerized loan application systems and federally-mandated record-keeping practices. Defendants have one or more databases through which all of the borrowers may be identified and ascertained, and it maintains contact information, including electronic mail and mailing address. From this information, the existence of the Class Members (i.e., borrowers' agents) can be determined, and thereafter, a notice of this action can be disseminated in accordance with due process requirements.

68.     Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

### FOR A FIRST CAUSE OF ACTION
**On Behalf of the Class**
**(Declaratory Judgment)**

69.     Plaintiff re-alleges each and every allegation set forth above as if fully set forth herein.

70.     Plaintiff and the Class represent individuals who are "agents" as defined by the SBA regulations for the PPP.

71.     Plaintiff and the putative Class have assisted clients with the process of preparing applications, any applying for, PPP loan funds. Defendants, despite the clear command of the SBA's PPP regulations, has refused to make these payments. An actual controversy has arisen

between Plaintiff and the Class, on one hand, and Defendants on the other, wherein Defendants deny by its refusal to pay that it obligated to pay Plaintiff's and the Class' "Agent" Fees pursuant to PPP regulations.

72.     Plaintiff and the Class seek a declaration, in accordance with the SBA regulations and pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Defendants are obligated to set aside money to pay, and pay third-party agents—within the SBA-approved limits—for the work performed on behalf of a client in relation to the preparation and/or submission of a PPP loan application that resulted in a funded PPP loan.

### FOR A SECOND CAUSE OF ACTION
**On Behalf of the Class**
**(Breach of Agreement Between Defendants And The SBA, Third Party Beneficiary)**

73.     Plaintiff re-alleges each and every allegation set forth above as if fully set forth herein.

74.     On information and belief, Defendants entered into an agreement with the SBA in connection with the loans funded in the PPP in order to become approve PPP lenders.

75.     The agreements required that Defendants adhere to all PPP rules and regulations and incorporate these requirements by reference. Defendants and the SBA understood that agents involved in the preparation and submission of the PPP loan applications would need to be compensated.

76.     The SBA's PPP regulations specifically require that PPP lenders pay the fees of any agent that assists with the PPP loan application process, within limits.

77.     Defendants understood that Plaintiff and the Class were intended beneficiaries in this agreement. Nevertheless, Defendants have refused to live up to its end of the bargain and has uniformly refused to pay Agent Fees to Plaintiff and the Class.

78.     By refusing to pay Agent Fees in accordance with the SBA regulations, Defendants are violating the terms of its agreement, thereby damaging Plaintiff and the Class. Plaintiff and the Class thus ask this Court to award it damages sufficient to make it whole, and compensate it for work it did in preparing client's PPP loan application for loans that were funded, consequential damages, and all other damages available at law.

## FOR A THIRD CAUSE OF ACTION
### On Behalf of the Class
**(Breach of Agreement Between Defendants and Borrowers, Third-Party Beneficiary)**

79.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

80.     Based on information and belief, Defendants entered into loan agreements with borrowers in connection with the loans funded in the PPP.

81.     Those agreements necessarily incorporated the PPP rules and regulations, including the requirement that Defendants pay agency fees.

82.     The SBA's PPP regulations specifically require that PPP lenders pay the fees of any "agent" that assists with the PPP loan application process, within limits.

83.     Defendants understood that Plaintiff and the Class were intended beneficiaries in this agreement. Nevertheless, Defendants have refused to live up to their end of the bargain and have uniformly refused to pay agent fees to Plaintiff and the Class.

84.     By refusing to pay agent fees in accordance with SBA regulations, Defendants are violating the terms of their agreements, thereby damaging Plaintiff and the Class. Plaintiff and the Class thus ask this Court to award them damages sufficient to make them whole, and compensate them for work they did in preparing clients' PPP loan application for loans that were funded, consequential damages, and all other damages available at law.

**FOR A FOURTH CAUSE OF ACTION**
**On Behalf of the Class**
**(Unjust Enrichment)**

85.    Plaintiff re-alleges each and every allegation set forth above as if fully set forth herein.

86.    Unjust enrichment, or restitution, may be alleged where a defendant unjustly obtains and retains a benefit to the plaintiff's detriment, where such retention violates fundamental principles of equity, justice, and good conscience.

87.    Here, Defendants have obtained millions of dollars in benefits in the form of PPP loan origination fees. A portion of those fees were to be paid to agents, like and including Plaintiff, who assisted in their clients' PPP loan applications. But Defendants are refusing to pay those fees, in contravention of PPP regulations and to the detriment of Plaintiff and the Class.

88.    Principles of justice, equity, and good conscience demand that Defendants not be allowed to retain these agent fees. Defendants have fallen short in their duties as lenders and have frustrated Congressional intent to aid small businesses, during a global health crisis no less. As a result, Plaintiff and the putative Class have been unable to obtain the agent fees due to them.

89.    Accordingly, Defendants must disgorge the portion of any and all PPP origination fees that it has retained to the extent they are due to Plaintiff and the putative Class in their capacities as agents.

**FOR A FIFTH CAUSE OF ACTION**
**On Behalf of the Class**
**(Conversion)**

90.    Plaintiff re-alleges each and every allegation set forth above as if fully set forth herein.

91.     Under the SBA's PPP regulations, Plaintiff and the Class, as PPP agents, have a right to Agent Fees that must be paid from the amount of lender fees provided to Defendants for processing Plaintiff's client's PPP loan applications.

92.     The PPP regulations state that "[a]gent fees *will* be paid out of lender fees" and provide guidelines on the amount of agent fees that should be paid to the PPP agent, based upon the size of the PPP loan.

93.     Additionally, the PPP regulations require that lenders, not loan recipients, pay the agent fees. The same regulations unequivocally state that "[a]gents may not collect fees from the applicant."

94.     Plaintiff and the Class assisted clients with applying for PPP loans, including gathering and curating information necessary for completing PPP loan applications that were subsequently funded. Due to Plaintiff's and the Class's efforts, their clients were awarded PPP loans from Defendants. As such, Plaintiff and the Class have a right to immediate possession of the Agent Fees.

95.     At the time that the PPP loan applications for Plaintiff's clients were funded, Plaintiff became entitled to agent fees under the PPP regulations. However, Defendants have refused to provide those fees to Plaintiff and the Class, instead keeping the agent fees paid to it for purposes of being passed on to agents.  By withholding these fees, Defendants have maintained wrongful control over Plaintiff's and the Class's property inconsistent with Plaintiff's and the Class's entitlements under the PPP regulations.

96.     Defendants have committed civil conversion by retaining monies owed to Plaintiff and Class members.

97.     Plaintiff and the Class have been injured as a direct and proximate cause of Defendants' misconduct. Plaintiff seeks recovery from Defendants in the amount of the owed agent fees, and all other relief afford under the law.

### FOR A SIXTH CAUSE OF ACTION
### On Behalf of the Class
### (Misappropriation)

98.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

99.     Plaintiff and Class Members expended substantial time, effort, and skill in assisting their clients to prepare and submit PPP loan applications.

100.     Defendants knew, or should have known, that Plaintiff and Class Members were expending substantial time, effort, and skill to assist applicants. Defendants have benefitted from Plaintiff and Class Members' labor because that labor enabled many small businesses to apply for loans, which would otherwise have been without the means and ability to do so, either entirely or in a timely enough fashion to actually receive funds. Defendants received fees from those successful applications.

101.     Acting in bad faith, Defendants have refused to pay Plaintiff and Class Members their statutorily mandated fees. Thus, Defendants have misappropriated the labor, skills, and expenditures of Plaintiff and Class Members.

102.     Plaintiff and the Class have been injured as a direct and proximate cause of Defendant's misappropriation, and seek recovery from Defendants in the amount of the owed agent fees, and all other relief afforded under the law.

## DEMAND FOR JURY TRIAL

103.    Plaintiff demands a trial by jury on all issues to the fullest extent permitted under applicable law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Ratliff, individually and on behalf of the Class, respectfully prays for the following relief:

A.  An order certifying the Class as defined above, appointing Plaintiff as the representative of the Class, and appointing its counsel as Class Counsel;

B.  An order declaring that Defendants' actions, as set out above, constitute unjust enrichment, conversion, misappropriation, breach of contract, and violations of the SBA's PPP regulations;

C.  An award of all economic, monetary, actual, consequential, compensatory, and punitive damages available under the law and caused by Defendants' conduct, including without limitation, actual damages for past, present and future expenses caused by Defendants' misconduct, lost time and interest, and all other damages suffered, including any damages likely to be incurred by Plaintiff and the Class;

D.  An award of reasonable litigation expenses and attorneys' fees;

E.  An award of pre- and post-judgement interest, to the extent allowable;

F.  The entry of an injunction and/or declaratory relief as necessary to protect the interests of the Plaintiff and the Class; and

G.  Such other further relief that the Court deems reasonable and just.


[Signature Page to Follow.]

Respectfully submitted,


By:    */s/ Michael D. Wright*


Richard A. Harpootlian (Fed I.D. No.1730)
RICHARD A. HARPOOTLIAN, P.A.
1410 Laurel Street (29201)
Post Office Box 1090
Columbia, SC 29202
Telephone: (803) 252-4848
Facsimile: (803) 252-4810
rah@harpootlianlaw.com


Mark C. Tanenbaum (Fed I.D. No. 4071)
MARK C. TANENBAUM, P.A.
1017 Chuck Dawley Blvd., Suite 101
Mt. Pleasant, SC 29464
Telephone: (803) 577-5100
Facsimile: 843-722-4688
mark@tanenbaumlaw.com

Vincent A. Sheheen (Fed I.D. No. 7016)
Michael D. Wright (Fed I.D. No. 11452)
SAVAGE, ROYALL & SHEHEEN, L.L.P.
P.O. Drawer 10
Camden, S.C. 29021
Telephone: (803) 432-4391
Facsimile:  (803) 425-4812
mwright@thesavagefirm.com


Richard D. McCune (*pro hac vice* motion forthcoming)
Michele M. Vercoski (*pro hac vice* motion forthcoming)
MCCUNE WRIGHT AREVALO LLP
18565 Jamboree Road, Suite 550
Irvine, California 92612
Telephone: (909) 557-1250
Facsimile: (909) 557-1275
Email: rdm@mccunewright.com


Attorneys for Plaintiff and Putative Class

August 14, 2020